# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SHAYA RESTAURANT, LLC** | **CIVIL ACTION** |
| **Plaintiff** | **NO. 17-cv-10935** |
| **VERSUS** | |
| | **SECTION "B"** |
| **ALON SHAYA, CHEF ALON SHAYA, LLC, and POMEGRANATE HOSPITALITY, LLC** | **MAGISTRATE 1** |
| **Defendants** | |

---

### MEMORANDUM IN OPPOSITION TO
### MOTION FOR PRELIMINARY INJUNCTION

Richard C. Stanley, 8487 T.A.
Bryan C. Reuter, 23910
Jennifer L. Thornton, 27109
Brendan A. Curtin, 35732
STANLEY, REUTER, ROSS,
  THORNTON & ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone:   504-523-1580
Facsimile:   504-524-0069

*Counsel for Shaya Restaurant, LLC, John Besh,
and Octavio Mantilla*

# MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Counterclaim Defendant Shaya Restaurant, LLC ("Shaya Restaurant") and Third Party Defendants John Besh and Octavio Mantilla respectfully submit this Opposition to the Motion for Preliminary Injunction filed by Alon Shaya and Chef Alon Shaya, LLC (collectively "CAS").

## I.    INTRODUCTION

Denial of the motion is warranted first and foremost because CAS has not demonstrated, nor can demonstrate, that it has a protected interest in the "Shaya" mark that is being used by Shaya Restaurant. In fact, written communications from Mr. Shaya and documents authored by him and his counsel, attached hereto and withheld by CAS from the motion, leave no doubt that Mr. Shaya knows he does not own the mark and that Shaya Restaurant, LLC is contractually and legally entitled to use the name and mark notwithstanding that he is no longer affiliated with the restaurant. Directly contrary to his pleadings and declaration in this case, Mr. Shaya unequivocally acknowledged years ago that Shaya Restaurant, LLC has the right to use the "Shaya" name and mark without his consent and that <u>he</u> would need a license <u>from Shaya Restaurant</u> if he wanted to use the mark for a restaurant other than the famous Magazine Street restaurant.

Also fatal to the motion is that the threatened injury to Shaya Restaurant if the injunction is granted far outweighs any supposed injury to CAS if the status quo is maintained between now and trial. In fact, the injunction proposed by CAS would likely result in the forced closing of the acclaimed restaurant, substantial loss of anticipated business income, and the incurring of significant costs, time, and resources to develop and open a new restaurant in that location. Thus, the extraordinary relief that CAS seeks, which is mandatory in nature (*i.e.*, seeking to force Shaya Restaurant to take expensive and harmful action), does not simply ask this Court to maintain the status quo pending trial. Instead, the injunction, itself, will likely cause irreparable and permanent harm to Shaya Restaurant and its business that cannot be remedied by monetary damages.

As explained herein and in the supporting declarations, CAS's implied assertion that changing the name of Shaya would be a relatively easy task and not be overly disruptive is wrong and displays a lack of understanding as to the value of a brand and the great expense and risk involved in attempting to rebrand a known service and commodity. Conversely, CAS does not operate a competing "Shaya" restaurant – or any restaurant – that would conceivably be harmed by Shaya Restaurant's continued operation between now and trial on January 28, 2019. In fact, CAS's four-month delay in even seeking injunctive relief strongly rebuts any presumption or contention that a preliminary injunction is necessary or appropriate.

The fact that CAS does not currently have a competing restaurant business that uses the "Shaya" mark, and has never operated a restaurant, also requires denial of its motion. It is legally impossible that customers could be confused as to which Shaya Restaurant they are going when there is, and always has been, only one.

Finally, CAS's conclusory statements that its reputation and business are being injured by Shaya Restaurant's continued use of its name and mark is wholly unsupported by any competent evidence. Even if the Court were to consider the improper hearsay documents attached to Mr. Shaya's declaration (newspaper articles, one email, and a "tweet"[1]), those materials, if anything, show that (1) the October 21, 2017 nola.com article regarding allegations of sexual harassment in certain restaurants in the Besh Restaurant Group ("BRG"), includes allegations by restaurant staff regarding Mr. Shaya and the very restaurants which he managed before termination, and (2) those allegations against BRG and Mr. Shaya and other press about BRG that followed have not impacted diners' appreciation of Shaya Restaurant. The email and tweet, purportedly from two of Shaya Restaurant's customers in December 2017, which was months after Mr. Shaya's departure,

_____

[1] Shaya Restaurant is filing concurrently with its Opposition, a Motion to Strike those exhibits.

highly praise and complement the restaurant, its food, service, and management and certainly do not demonstrate that CAS's reputation would be tarnished in any way by Shaya Restaurant's continued use of the Shaya name and mark.

In sum, CAS has not come close to making a *prima facie* case of trademark infringement, false endorsement, unfair competition, or injury to its business or reputation. Nor has it shown that CAS will suffer any irreparable injury if the status quo (Shaya Restaurant continuing to operate under its name and mark) is maintained prior to trial, as opposed to a forced shut-down and extremely risky renaming and rebranding of the restaurant. Four months have already passed since Mr. Shaya's departure from the restaurant and there is no evidence presented by CAS of any harm as a result of Shaya's continued operations. The motion should, accordingly, be denied.

## II.     BACKGROUND

### A.     Alon Shaya has never owned or used the "Shaya" mark in conjunction with a restaurant; Shaya Restaurant, LLC was the first to use it in commerce.

Octavio Mantilla, a co-founder and co-owner of the restaurants making up BRG,[2] met Alon Shaya at a Harrah's restaurant where Mr. Shaya was the chef and recruited him to move to New Orleans and work as a buffet chef at the New Orleans Harrah's Casino.[3] Later, Messrs. Mantilla and Besh recruited Mr. Shaya to work at Besh Steakhouse, where he was the Chef de Cuisine under John.[4] Over the following years, Alon worked under and was mentored by John.

---

[2] BRG refers both to the name that has been used over the years to refer to the family of restaurants developed and owned by Messrs. Besh and Mantilla, and also to the company (BRG Hospitality) that provides corporate, administrative, accounting, and back-office work to that group of restaurants (the "corporate office"). Each restaurant is a separate company with different owners and membership interests. Declaration of Shannon White, Ex. C, ¶¶ 2-3; Declaration of Raymond Landry, Ex. D, ¶ 2, n.1.

[3] Declaration of Octavio Mantilla, Ex. A, ¶¶ 13-14.

[4] *Id.*

After Hurricane Katrina, BRG became a major driving force in the recovery, growth and revitalization of New Orleans's restaurant scene. Its list of restaurants continued to grow and receive critical acclaim both locally and nationally, and Mr. Shaya, a talented young chef was rising through the BRG ranks as the family of restaurants expanded. In or around 2008, when BRG decided to open an Italian restaurant in the Roosevelt Hotel (Domenica), Messrs. Besh and Mantilla arranged for Mr. Shaya to travel and study Italian cooking in Italy.[5] Domenica, the concept and branding for which Mr. Shaya had no involvement, opened in 2009, and Mr. Shaya was hired as its Executive Chef.[6] The restaurant has been very successful, and, in 2014, Messrs. Mantilla, Besh, and Shaya collaborated to open Pizza Domenica, a casual, uptown spin-off.[7]

In or around mid-2014, Mr. Mantilla was approached by the owner of the building now occupied by Shaya Restaurant about whether BRG had any interest in the space.[8] The restaurant Dominique's had been operating there at the time, but was closing due to slow business. Mr. Mantilla expressed interest, and early discussions with Mr. Besh were to open an Italian restaurant in the spot with a different chef.[9] Mr. Shaya was not part of the original discussion or anticipated concept.[10] For various reasons, the idea to open an Italian restaurant in the space was abandoned, and Mr. Mantilla suggested that BRG open a restaurant featuring Israeli cuisine, a concept that Mr. Besh had been considering since he traveled to Israel in June 2011 with Mr. Shaya and another

---

[5] Mantilla Dec., Ex. A, ¶ 17; Declaration of John Besh, Ex. B, ¶ 8.

[6] Mr. Shaya was and remains a minority interest holder in Domenica Restaurant, LLC. *See* Mantilla Dec., Ex. A, ¶ 17; Besh Dec., Ex. B, ¶¶ 9, 15.

[7] Mantilla Dec., Ex. A, ¶ 18; Besh Dec., Ex. B, ¶ 10. Mr. Shaya was formerly a minority interest holder in Pizza Domenica, LLC. *See* Besh Dec., Ex. B, ¶¶ 10, 15.

[8] Mantilla Dec., Ex. A, ¶ 19.

[9] Mantilla Dec., Ex. A, ¶ 20.

[10] Mantilla Dec., Ex. A, ¶¶19-21.

local chef.[11]  They then decided to ask Mr. Shaya if he was interested in developing the concept for the restaurant with them.[12]  Although skeptical at first, Mr. Shaya agreed to join the venture.[13]

Mr. Mantilla suggested they call the newest BRG restaurant "Shaya," the three agreed, and they formed Shaya Restaurant, LLC on October 7, 2014 to own and operate the restaurant.[14]  At that time, there was no claim by Mr. Shaya that he owned the rights to the "Shaya" restaurant name or that the restaurant could only be named "Shaya" if he remained involved, because that claim would be false.[15]  The Operating Agreement clearly provided that, within the first five years of the Company's existence, members with an interest of 60% or greater (*i.e.*, any two members) could redeem the third member's interests with or without that member's consent in exchange for a return of the member's capital account balance.[16]  Upon such redemption, the Company and restaurant continues, and there is no provision requiring any change in name or operations.[17]  As detailed herein, Mr. Shaya unequivocally was aware of that provision and that, if his interests were redeemed, Shaya Restaurant would continue without him.

The "Shaya" logo and mark:



---

[11] Mantilla Dec., Ex. A, ¶ 21; Besh Dec., Ex. B, ¶ 11.

[12] Mantilla Dec., Ex. A, ¶ 22; Besh Dec., Ex. B, ¶ 11.

[13] Mantilla Dec., Ex. A, ¶¶ 21-22; Besh Dec., Ex. B, ¶ 11.

[14] Mantilla Dec., Ex. A, ¶¶ 22-24; Besh Dec., Ex. B, ¶¶ 11, 14.

[15] Mantilla Dec., Ex. A, ¶ 22; Besh Dec., Ex. B, ¶ 11.

[16] Section 8.10 of the Shaya Restaurant, LLC Operating Agreement, attached as Exhibit A to Shaya Declaration, Doc. 12-3, at p. 19.

[17] *See id.*

was developed with the assistance of employees of BRG for Shaya Restaurant, LLC's use.[18]

Although Mr. Shaya was certainly involved in the development of the logo and restaurant concept

and menu, it was always understood that the Company owned the mark and had the exclusive right

to use it on the Magazine Street restaurant.[19]  Although BRG provided corporate support and

employee time and resources in the early stages, the funding for the restaurant's startup was

provided through a loan from Whitney Bank to Shaya Restaurant, LLC (not through any capital

investment by Mr. Shaya).[20]  The three members of the Company guaranteed the loan.[21]

The development and opening of Shaya moved extremely quickly for a new restaurant.  As

discussed by Mr. Mantilla, typically the development and startup of a new restaurant in New

Orleans takes approximately two years and can cost over $1.5 million.[22] Everyone worked very

fast on Shaya, and because it was opening in a space already built out for a restaurant (although

the décor had to be changed and the build-out modified), the Company was able to open it within

approximately three and one-half months of obtaining the space.[23]  The Company, with BRG's

assistance, was also able to engage in extensive advance marketing of the restaurant, such that

there was much anticipation and a high level of interest surrounding the opening of the restaurant

in February 2015.[24]  Notably, Mr. Shaya claims in his declaration that he first used the "Shaya"

---

[18] Mantilla dec., Ex. A, ¶¶ 27-29; White dec., Ex. C, ¶ 5.

[19] Mantilla Dec., Ex. A, ¶ 22; Besh Dec., Ex. B, ¶ 11; White dec., Ex. C, ¶¶ 5-6.

[20] Mantilla Dec., Ex. A, ¶ 26; Besh Dec., Ex. B, ¶ 12.

[21] Mantilla Dec., Ex. A, ¶ 26; *see also* Besh Dec., Ex. B, ¶ 12.

[22] Mantilla Dec., Ex. A, ¶ 25.  Mr. Mantilla's declaration explains the basis for that figure in ¶ 25. Because certain financial and proprietary information regarding BRG's restaurants and Shaya Restaurant is confidential, that specific information has been redacted in the declarations attached hereto.  Shaya Restaurant is filing a motion for leave to submit the unredacted versions of the declarations under seal.

[23] Mantilla Dec., Ex. A, ¶ 25; White Dec., Ex. C, ¶¶ 5-6.

[24] Mantilla Dec., Ex. A, ¶¶ 27-28; Besh Dec., Ex. B, ¶ 12; White Dec., Ex. C, ¶¶ 7-8.

name and mark in connection with restaurant services in February 2015 (Doc. 12-2, ¶ 18), but he is obviously referencing when Shaya Restaurant, LLC opened the restaurant with the name and mark <u>it</u> owns. That is the first time to Shaya Restaurant's knowledge that the "Shaya" mark and name has been used in commerce in connection with a restaurant.[25]

### B. Later, Mr. Shaya asked Shaya Restaurant to grant him rights in the "Shaya" name and mark that he knew he did not otherwise have.

Shaya opened on February 13, 2015, during Mardi Gras, with Mr. Shaya as its Executive Chef.[26] It quickly became a popular and highly acclaimed restaurant, in large part because BRG and Shaya Restaurant, LLC built a nationwide public relations campaign around the restaurant that lasted well into the 2016 awards season in which Shaya won the prestigious James Beard Award for Best New Restaurant.[27] Additionally, Bon Appetit named Shaya one of the top 50 new restaurants in America, and Food and Wine named it as one of the top 10 new U.S. restaurants.[28] Shaya has continued to receive national acclaim, drawing diners to New Orleans to Shaya from around the country. The restaurant repeatedly features in national media outlets, and consistently ranks highly among New Orleans restaurants on popular travel websites.

After the restaurant demonstrated success, through the collaborative efforts of BRG and Shaya Restaurant and through great expense of the Company, Mr. Shaya expressed serious concern about his rights to use the restaurant name and mark apart from the restaurant itself or with respect to future endeavors, which rights he knew he did not otherwise have. Specifically, in or around October 2015, over a year after Shaya Restaurant, LLC was formed, and during discussions by the

---

[25] White Dec., Ex. C, ¶ 6.

[26] White Dec., Ex. C, ¶ 6. Mr. Shaya remained the Executive Chef at Domenica after Shaya opened, and it was in that role that he won the James Beard Award for Best Chef-South in 2015.

[27] Mantilla Dec., Ex. A, ¶ 28; Besh Dec., Ex. B, ¶ 12; White Dec., Ex. C, ¶¶ 7-8.

[28] Mantilla Dec., Ex. A, ¶ 28; White Dec., Ex. C, ¶ 8.

parties regarding opening a casual, counter-service spinoff of Shaya ("Hummusiya," discussed *infra*), Mr. Shaya raised for the first time that he would like for Shaya Restaurant and/or Messrs. Mantilla and Besh "***to grant [him] exclusive rights to the name 'Shaya Restaurant' and 'Shaya.'***"[29] That request was included in a list of items that Mr. Shaya and his same counsel in this case put together that Mr. Shaya wanted to see changed in the operating agreements for the companies in which he was a member, which were Shaya Restaurant, Domenica Restaurant, and Pizza Domenica.[30] It goes without saying that Mr. Shaya would not have requested that rights to the name "Shaya Restaurant" and "Shaya" be granted to him by the Company if he believed he already unequivocally owned the rights to the restaurant name and had impliedly licensed them to the Company as stated in his pleadings and sworn declaration. Quite simply, the declaration of Mr. Shaya and argument in his pleadings are completely at odds with the facts.

Contrary to his declaration, Mr. Shaya's valid concern that he had no rights in the restaurant's name was discussed with corporate counsel and Mr. Mantilla, and was the genesis of the December 3, 2015 email from Mr. Landry attached to Mr. Shaya's declaration as Ex. C. As Mr. Landry stated in the email, he believed that, of the items in Mr. Shaya's "Issues List" from the October 2015 email, the most sensitive issue was Mr. Shaya's request for rights to the name and mark, although he believed at the time that some agreement may be possible. Mr. Shaya's memorandum to the Court quotes selectively from the email and omits Mr. Landry's statement to Mr. Shaya that "you have partners in our existing restaurant, that has already become a prominent

---

[29] October 21, 2015 Email from Alon Shaya to BRG and Shaya Restaurant corporate counsel Raymond Landry, Ex. D-1, p. 2, Item No. 6 (emphasis added).

[30] *Id.* Notably, also included in that list was a requested change to the redemption provision of the Operating Agreements that gave members with an interest of 60% or greater to redeem any member's interests within five years in exchange for a return of the member's capital account balance. *See id.*, Item No. 4. That was the provision enforced in September 2017 to redeem Mr. Shaya's interests in Shaya Restaurant. Mantilla Dec., Ex. A, ¶¶ 35, 40; Besh Dec., Ex. B, ¶ 15.

restaurant, that uses the name "Shaya" – so we just need to consider those competing concerns and finalize that decision in writing."[31]

After that email exchange, Mr. Shaya on one occasion and his attorney on a different occasion raised the same issue again in person with Mr. Landry.[32] As documented in another email from Mr. Shaya to Mr. Landry and in Mr. Shaya's own handwriting on a copy of the "Issues List" dated December 16, 2015, a potential amendment to the Shaya Restaurant, LLC Operating Agreement was proposed that would require a unanimous vote of the three members for any one of them or the Company to use the name "Shaya" apart from the Magazine Street restaurant in Louisiana in any future endeavors or business opportunities.[33] This again demonstrates that Mr. Shaya knew full well that he did not have the right to use the name or mark without the Company's and/or Messrs. Besh's and Mantilla's consent.

Thereafter in 2016, a proposed amendment was made to the Operating Agreement that would require unanimous consent of the three members for "the word 'Shaya'" to be used "by the Company for any purpose outside the state of Louisiana."[34] Mr. Shaya's response to that proposal is the most telling with respect to his knowledge and understanding that the Company exclusively owns the "Shaya" mark and name. On November 2, 2016, he forwarded a new "Issues List" to Mr. Landry and asked that it be discussed with Messrs. Mantilla and Besh.[35] Mr. Shaya stated the following in that "Issues List":

3.   **Control over the name "Shaya"**:   The rights in my name, "Shaya", are a big issue for me.  I am concerned about my name if you vote to redeem my shares, or if I am placed in the position of having to leave the restaurants. Here is what I propose:

---

[31] Ex. C to Shaya Declaration, Doc. 12-5.

[32] Landry dec., Ex. D, ¶¶ 7, 9.

[33] Landry dec., Ex. D, ¶ 7, with Ex. D-2.

[34] Landry dec., Ex. D, ¶ 11, with Ex. D-4, at p. 7 (highlighted).

[35] Ex. D-3.

a. If I am no longer part of Shaya Restaurant for any reason, Shaya Restaurant must change its name within one (1) year. That gives you time to restructure the restaurant into something new, with a new name.

b. If I am no longer part of Shaya Restaurant for any reason, I will be able to use "Shaya" in the name of my new restaurant, provided the location of the new restaurant is more than one (1) mile from the current location of Shaya Restaurant.

c. Now that I have press on the national stage and an upcoming cookbook release, opportunities outside of Louisiana may be presented to me. The revised operating agreement for Shaya Restaurant provides that unanimous consent of the members is required to use the word "Shaya" for any purpose outside the state of Louisiana. If I am interested in starting a new restaurant in another part of the county, I would go to you first. But, if you decided not to participate, I would want to be able to use Shaya in the name. I ask you to consider waiving the consent requirement to use "Shaya" outside the state of Louisiana.

These proposed amendments, which were never agreed upon or adopted, are admissions by Mr. Shaya that the restaurant owns the name and can continue using it with or without his involvement and he has no right to use the name "Shaya" on a new restaurant in or outside Louisiana without the Company's consent. These admissions are simply irreconcilable with Mr. Shaya's statements in this lawsuit that he has always owned the exclusive rights to the "Shaya" name and mark, that he granted Shaya Restaurant, LLC an implied license to use the name and mark while he was involved with the restaurant, and that Shaya Restaurant has no continued right to use the name and mark without his consent. His position today is not believable in the light of these earlier, fatal admissions. It is also legally wrong because he has never used the "Shaya" name and mark in connection with a restaurant.

**C.    There has never been any acknowledgement by Shaya Restaurant or its members that Mr. Shaya has any rights to the "Shaya" name and mark.**

Struggling to find something to present to the Court showing that CAS owns and uses the "Shaya" mark, CAS comes up with two unavailing arguments and one unsupported and inaccurate fact. First, CAS contends that BRG and Shaya Restaurant's corporate counsel's assistance and registration of Chef Alon Shaya, LLC with the Louisiana Secretary of State in 2016 somehow shows an acknowledgement that Mr. Shaya "retained all rights" in the name. Memorandum, p. 6.

That Mr. Shaya owns a limited liability company called "Chef Alon Shaya" does not touch on use of the Shaya Restaurant name and mark though. His name is Alon Shaya, and he is a chef. The LLC name does not use the distinctive "Shaya" mark or compete with the restaurant. And, as Mr. Shaya knows, the purpose of the company when it was formed was simply for Mr. Shaya to run through it and track personal, but business-related, expenses.[36] It is unknown what exactly Mr. Shaya uses the LLC for today, but it has no public presence to Shaya Restaurant's knowledge.

CAS's second argument regarding alleged acknowledgment by Shaya Restaurant of its rights to the "Shaya" name and mark involves that he has a cookbook, currently available for pre-order, that includes his last name on the cover:



The cover not only does not use or feature the Shaya Restaurant mark or logo, but clearly references that it is about Alon Shaya and his travels to Israel. If Mr. Shaya has, in fact, used Shaya Restaurant's name, mark, or logo "throughout the cookbook" as he states in his declaration, Shaya Restaurant has not consented to that use of its mark.[37] Regardless, the forthcoming cookbook is not a competing business with Shaya Restaurant.

Finally, CAS and Mr. Shaya in his declaration claim that BRG, Shaya Restaurant, and/or Messrs. Besh and Mantilla presented him with three proposals to open "Shaya" branded restaurants

---

[36] Landry dec., Ex. D, ¶ 15.
[37] Mantilla Dec., Ex. A, ¶ 36.

after the original Shaya opened, but that the proposals were not pursued because Mr. Shaya rejected them and his consent was required. Again, Mr. Shaya presents no evidence demonstrating these supposed facts, presumably because this narrative is inaccurate. Although there were casual and informal conversations at times about opening another Shaya outside of Louisiana, the parties ultimately agreed that they would <u>not</u> open another "Shaya" so as to preserve the unique brand and fame of the Magazine Street restaurant.[38] What was discussed in 2015 and 2016 was opening a casual, counter-service spinoff of Shaya that would be possibly be named "Hummusiya" or "Hummusiya Shaya."[39] Shaya Restaurant registered both "Hummusiya" and "Hummusiya Shaya" in 2015, demonstrating again its right to use the "Shaya" name.[40] Evidence related to the parties' consideration of the "hummusiya" concept is contained in a September 2015 email from Mr. Shaya to the architect BRG used for all of its restaurants.[41] The concept was not pursued for reasons related to the location and not because Mr. Shaya rejected it due to some issue with the name.[42]

Mr. Shaya's self-serving declaration fails on all fronts to show that he ever owned or used the "Shaya" name or mark in a restaurant business or that Shaya Restaurant has ever recognized that he owns any such rights.

### D. The parties' relationship deteriorated in 2017 to a point where all agreed they no longer wanted to work together in any of their three restaurants.

As Mr. Shaya acknowledges, by 2017, it was evident that the three members of Shaya Restaurant needed to sever their business ties. Discussions were had, on and off, throughout the first half of the year as to an amicable way to part ways, and there was discussion and consideration

---

[38] Mantilla dec., Ex. A, ¶ 37; White dec., Ex. C, ¶ 9.
[39] Mantilla dec., Ex. A, ¶¶ 30-32.
[40] Mantilla dec., Ex. A, ¶ 30.
[41] Mantilla dec., Ex. A, ¶ 32, with Ex. A-1.
[42] Mantilla dec., Ex. A, ¶ 32.

by Messrs. Mantilla and Besh of selling their interests in Shaya Restaurant to Mr. Shaya.[43] Tensions continued to rise between during the summer of 2017, however, as Mr. Shaya demanded a separation on his terms, while at the same time he remained largely absent from their three restaurants because he was too busy traveling, self-promoting, and working on his upcoming cookbook, all on BRG's and Shaya Restaurant's nickel.[44] This all ultimately led to the September 18, 2017 termination of Mr. Shaya's employment, which was an at-will employment relationship, and the redemption by Shaya Restaurant, LLC of his membership interests in the Company, a possibility Mr. Shaya acknowledged in the "Issues Lists" he created in 2015 and 2016.[45] Although Messrs. Besh and Mantilla had been and remained open to selling their interests in Shaya Restaurant to Mr. Shaya on fair terms, he never made a reasonable proposal, and the parties' personal and business relationship deteriorated to a point that required a complete separation.[46]

Mr. Shaya's allegation that he was fired for giving an interview to Brett Anderson is false. Messrs. Mantilla and Besh were already aware that Mr. Anderson was interviewing current and former employees of BRG restaurants, knew Mr. Shaya meeting with Mr. Anderson, and never discouraged him from doing so.[47] But, it was during this time, that Mr. Shaya was becoming increasingly combative, disparaging, and offensive towards the two men who, for over a decade, had not only been his mentors and colleagues, but his friends.[48] By September 18, 2017, the parties' relationship had fully disintegrated, which made Mr. Shaya's continued employment at BRG restaurants completely untenable. At the time of that meeting, it was not even known whether

---

[43] Mantilla dec., Ex. A, ¶¶ 38-39; Besh dec., Ex. B, ¶ 14.

[44] Mantilla dec., Ex. A, ¶¶ 33, 38-39; Besh dec., Ex. B, ¶ 13; White dec., Ex. C, ¶ 10.

[45] Mantilla dec., Ex. A, ¶¶ 38-40; Besh dec., Ex. B, ¶ 15.

[46] Mantilla dec., Ex. A, ¶ 39; Besh dec., Ex. B, ¶¶ 14-15.

[47] Mantilla dec., Ex. A, ¶ 41; Besh dec., Ex. B, ¶ 15.

[48] Mantilla dec., Ex. A, ¶ 40; Besh dec., Ex. B, ¶¶ 13-15.

Mr. Anderson's article would be finished or published or what the full nature of it would be.[49] Any suggestion that Mr. Shaya was a "whistleblower" or fired as a result is simply not true.

###    E.    Shaya Restaurant has continued to operate without interruption, and there is no evidence of harm or injury to CAS.

CAS claims irreparable and imminent injury if its motion is not granted, but the exact opposite is true. Shaya Restaurant has continued to operate, without interruption, since Mr. Shaya was terminated over four months ago. Although Mr. Anderson's article and subsequent press resulted in changes in leadership and corporate structure,[50] there is simply no evidence that CAS has been injured or harmed, or will be, in anyway by Shaya Restaurant's continued use of its name and mark. Rven the improper "evidence" attached as Exhibit L to Mr. Shaya's declaration (December 2017 email and "tweet"), show that customers are pleased by the restaurant, its food, management, and service. Moreover, as noted previously, Mr. Anderson's article cites to employee complaints about Mr. Shaya personally and the restaurants he claims he oversaw before his termination. Any alleged harm he has suffered as a result of the article can fairly be cast on himself and not Shaya Restaurant's continued operations.[51]

## III.    LAW AND ARGUMENT

###    A.    Legal Standard for Preliminary Injunction

A preliminary injunction is an extraordinary remedy. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."); *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003). The

---

[49] Mantilla dec., Ex. A, ¶ 41; Besh dec., Ex. B, ¶ 15.

[50] BRG and Ms. White, its CEO, continue to work tirelessly to address the allegations regarding BRG's culture, to initiate programs and channels for employee concerns and complaints, and to educate employees at all levels of the corporate family to ensure workplaces that are free from harassment or hostility. White dec., Ex. C, ¶ 13.

[51] Ex. C to Shaya dec., at pp. 12-17.

Fifth Circuit has repeatedly cautioned that a preliminary injunction should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four required elements. *Bluefield Water Ass'n v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009). First, the applicant must show "a substantial likelihood that he will prevail on the merits;" second, he must demonstrate "a substantial threat that he will suffer irreparable injury if the injunction is not granted;" third, he must establish "that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin;" and fourth, he must show that "granting the preliminary injunction will not disserve the public interest." *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).

"The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971). When the applicant moves for a mandatory preliminary injunction, attempting to force parties to take action, however, "such relief should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party." *Id.* at 561; *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."); *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 335 (E.D. La. 2011) (citing *Martinez*, 544 F.2d at 1243).

**B.      CAS has not demonstrated a substantial likelihood of success on the merits.**

To show a likelihood of success, the plaintiff must present a *prima facie* case as to the elements of his underlying claims. *See Janvey v. Alguire,* 647 F.3d 585, 595-96 (5th Cir. 2011).

### 1.      Federal trademark infringement claim

To succeed on the merits of a federal common law trademark infringement claim, CAS must establish that it owns a protectable mark, that it is the senior user of the mark, and that there

is a likelihood of confusion between its mark and Shaya Restaurant's mark.  *See Action Ink, Inc. v. Anheuser-Busch, Inc.*, 959 F. Supp. 2d 934, 941 (E.D. La. 2013).

### a.        Ownership and First Use of the "Shaya" Mark

In this case, CAS does not come close to establishing a *prima facie* case that it owns or has ever used the "Shaya" mark in connection with a restaurant.  CAS relies only on Mr. Shaya's self-serving declaration in which he makes the conclusory statements that: he owns all rights and interest in the "Shaya" name and mark; he used the mark first in February 2015; Chef Alon Shaya, LLC is using the mark with Mr. Shaya's permission; and that company is using the mark in connection with restaurant, personal chef, and entertainment related services.  Memorandum, pp. 13-14.  CAS attaches *nothing* demonstrating any of these supposed facts.  Indeed, these "facts" have no basis in the record and have been shown to be inaccurate if not false.

As demonstrated above, the February 2015 date on which Mr. Shaya claims he first used the name and mark in connection with restaurant services is when Shaya on Magazine Street was opened by Shaya Restaurant, LLC.  He is correct that is the first time the name and mark was used in connection with a restaurant, but it was used by Shaya Restaurant, LLC, not Alon Shaya or CAS.  And, in the light of his own emails and "Issues Lists," Mr. Shaya cannot credibly dispute that he knows Shaya Restaurant, LLC owns that name and mark, had the right to use it in February 2015, and continues to have the right to use it on the restaurant.  Nor can Mr. Shaya or CAS possibly dispute that CAS does not operate any restaurant currently, because it does not.

For these same reasons, CAS's argument that Mr. Shaya granted an implied license to Shaya Restaurant, LLC to use the mark on the restaurant also fails. Although an owner of a protected mark may grant licenses to others to use the mark, and courts "may find an implied license to use a trademark when such a license can be reasonably inferred from the objective conduct of the parties," an implied license cannot be implicated when the purported licensor is not

the owner of the mark. *Brinkman v. Beaulieu of Am., Inc.*, No. 02-CA-268, 2002 WL 32097534, at *4 (W.D. Tex. Oct. 29, 2002); *see also First Fashion USA, Inc. v. Best Hair Replacement Mfrs., Inc.*, 645 F. Supp. 2d 1158, 1164-66 (S.D. Fla. 2009). The evidence from Mr. Shaya himself clearly reveals that he was not the owner of the "Shaya" name and mark back in 2015 and understands that <u>he</u> needs a license or grant of rights <u>from Shaya Restaurant</u> if he wants to use the name and mark on any other restaurant or competing business, which he is not doing in any event.

> **b.** **Likelihood of Confusion**

The Fifth Circuit uses the following factors to determine whether a likelihood of confusion exists: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers. *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

CAS claims, again in a conclusory fashion, that "there can be no dispute that Shaya Restaurant's use of the SHAYA Mark will result in likelihood of confusion," and asks the Court to take judicial notice "that the parties sell identical, directly competing services to the same consumers through the same channels of trade utilizing the same advertising vehicles." Memorandum, pp. 15-16. But CAS has not identified anywhere what is the allegedly "identical, directly competing service" it offers. In fact, it is unclear what, if anything, CAS does. But, what CAS does <u>not</u> do is operate a restaurant using the "Shaya" name and mark. Accordingly, it is not legally or factually possible for consumers to be confused when there is only one restaurant using the "Shaya" name. CAS falls far short of satisfying any part of the eight-factor test for confusion.

> **2.** ***False Endorsement Claim***

Similarly, for its false endorsement claim, CAS must establish that is owns a legally protectable mark and that Shaya Restaurant's use of the mark "to identify its goods or services is

likely to create confusion concerning [Alon Shaya's] sponsorship or approval of those goods or services." *Estate of Barre v. Carter*, No. CV 17-1057, 2017 WL 3188489, at *24 (E.D. La. July 25, 2017). Typically, "false endorsement" claims involve alleged deceptive commercial and advertising practices that include a false representation that a product or good is endorsed by a celebrity. *See id.* at *23-*24. The practice may include an actual false statement, unauthorized use of a celebrity's likeness or persona, or, as in the case of *Estate of Barre*, the celebrity's voice and performance, in an advertisement to imply endorsement or sponsorship. *Id.*; *see also Prudhomme v. Proctor & Gamble Co.*, 800 F. Supp. 390 (E.D. La. 1992) (involving the use of an actor who bore a striking resemblance to Chef Paul Prudhomme in advertising Folger's coffee to suggest Chef Prudhomme's endorsement of the product).

For instance, in the *Diller* case cited by CAS, the alleged infringers used a name meant to be confusing and intended to invoke the famous businessman Barry Diller's name and persona; *i.e.*, it used the name "Barry D**r**iller" for its domaine name and website. *Diller v. Barry Driller, Inc.*, No. CV 12-7200, 2012 WL 4044732 (C.D. Cal. Sept. 10, 2012). And, in *Amazon Inc. v. Cannondale Inc.*, No. 99 N 571, 2000 WL 1800639 (D. Colo. July 24, 2000), Cannondale used the name and likeness of a professional mountain bike racer, who had assigned those rights to Amazon, without consent in an advertising catalogue. In this case, however, there is no such use of or play on Alon Shaya's name, likeness, or persona in relation to Shaya Restaurant. Mr. Shaya's name, biography, and likeness have been removed from the restaurant's marketing and advertising materials,[52] and it is widely publicized that Alon Shaya is no longer affiliated with the restaurant,

---

[52] White dec., Ex. C, ¶ 15. Mr. Shaya pointed out in his declaration that a Google listing for the restaurant still included a reference to him as of the date CAS filed the motion. Shaya dec., Doc. 12-2, ¶ 47, with Ex. M. Although steps had been taken immediately upon Mr. Shaya's separation from the restaurant to have all such references removed, the Google listing apparently was not

as seen in the materials he attaches to his declaration. Further, unlike the *Agassi* case cited by CAS,[53] where Target advertised and sold "Agassi Sandals" without consent or actual sponsorship from the professional tennis player Andre Agassi, Mr. Shaya does not own the "Shaya" mark and Shaya Restaurant has always had the right to market its restaurant using the "Shaya" name.

Finally, false endorsement claims have been rejected when the complaining party cannot point to a false statement of endorsement. *See Mktg. Prod. Mgmt., LLC v. Healthandbeautydirec.com, Inc.*, 333 F. Supp. 2d 418, 431 (D. Md. 2004*)*. In that case, for instance, the complaining party alleged that an infomercial contained a false statement that he was part of the design team of a type of bicycle, when he was no longer affiliated with the product. *Id.* at 430. The court rejected his false endorsement claim, explaining that the statements in the advertisement were true, as the plaintiff did participate in the development of the product and endorsed it, even though he was no longer affiliated with it. *Id.* The court distinguished that case from other false endorsement claims, where "the facts generally involved depictions of or statements attributed to well-known individuals who in fact were in no way associated with the defendant's product." *Id.* at 431.

Here, although CAS cannot cross the first hurdle to maintaining this claim – that it owns a protectable mark – it also cannot point to any false statements or advertisements by Shaya Restaurant regarding Alon Shaya's former role in the company and restaurant. That two individuals purportedly think Mr. Shaya still has some role at the restaurant that he did help develop, as allegedly demonstrated by the unauthenticated email and "tweet" attached as Exhibit L to Mr. Shaya's declaration, hardly demonstrates any false endorsement by Shaya Restaurant.

---

changed at the time. Since receiving Mr. Shaya's motion, BRG has worked with Google to make sure that the reference has been removed. White dec., Ex. C, ¶ 15.
[53] *Agassi Enterprises, Inc. v. Target Corp.*, No. 2:07 CV 1252, 2007 WL 4441195 (D. Nev. Dec. 11, 2007).

### 3. Louisiana State Trademark Infringement, Unfair Trade Practices, Unfair Competition, and Dilution Claims

CAS's state trademark infringement claims largely mirror its federal claims and fail for the same reasons that CAS cannot demonstrate it owns a protectable mark or that Shaya Restaurant's use of the "Shaya" mark is likely to cause confusion among consumers. *See Prudhomme*, 800 F. Supp. at 395; *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 549 (5th Cir. 2015); *Gulf Coast Bank v. Gulf Coast Bank & Trust Co.*, 94-2203 (La. 4/10/95), 652 So. 2d 1306, 1309 (discussing that Louisiana's Trademark Act requires the owner of a protectable mark to prove likelihood of consumer confusion to enjoin another's use of a similar name or mark). Although CAS conflates the discussion of its state trademark claims (infringement and dilution, which arise under La. Rev. Stat. § 51:211, *et seq.*) with his claim under the Louisiana Unfair Trade Practices Act ("LUTPA"), the LUTPA claim is distinct and warrants some separate discussion.

LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). Recovery under LUTPA is available only to the extent the plaintiff is able to show an "ascertainable loss" caused by such unfair or deceptive conduct. *Id.* "A business practice is considered unfair if it offends established public policy and is unethical, oppressive, unscrupulous, or substantially injurious. A business practice is deceptive for purposes of LUTPA when it amounts to fraud, deceit or misrepresentation." *Nola Spice Designs*, 783 F.3d at 553 (5th Cir. 2015) (quotation omitted). To prevail, CAS must show that "the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Quality Envtl. Processes, Inc. v. I.P. Petroleum Co.*, 13-1582 (La. 5/7/14); 144 So. 3d 1011, 1025. The Louisiana Supreme Court has cautioned that "the range of prohibited practices under LUTPA is extremely narrow," providing that only "egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA." *Id.* Moreover, the

competitor's "motivation is a critical factor—his actions must have been taken with the specific purpose of harming the competition." *Monroe v. McDaniel*, 16-214 (La. App. 5 Cir. 12/7/16); 207 So. 3d 1172, 1180.

CAS's invocation of LUTPA is unavailing and appears to be part of its kitchen-sink approach in its pleadings. It has pointed to no allegedly unscrupulous, deceptive, or unethical conduct by Shaya Restaurant in continuing to operate under the "Shaya" name and mark, and, as discussed, Shaya Restaurant's continued use of its name cannot possibly be harming any competitive business of CAS, because CAS does not operate a restaurant or use the "Shaya" mark. CAS has also undoubtedly failed to demonstrate a *prima facie* showing of any "ascertainable loss."

### 4. *Right to Privacy and Publicity Claim*

The tort of invasion of privacy can include "misappropriation of a person's name or likeness," but such a violation "is actionable in Louisiana only when a defendant's conduct is unreasonable and seriously interferes with a plaintiff's privacy interest." *Sapia v. Regency Motors of Metairie, Inc.*, 276 F.3d 747, 752 (5th Cir. 2002). "Reasonableness is determined after balancing the plaintiff's privacy interest against the defendant's interest in pursuing his course of conduct." *Id.*; *Jaubert v. Crowley Post-Signal, Inc.*, 375 So. 2d 1386, 1389 (La. 1979). When an individual consented to the defendant's conduct, he is unable to establish an invasion of privacy as a matter of law. *Tate v. Woman's Hosp. Found.*, 10-0425 (La. 1/19/11); 56 So. 3d 194, 199 (holding there was no invasion of privacy where the plaintiff consented to DNA testing); *see also Tanner-Brice Co. v. Sims*, 174 Ga. 13, 161 (1931) (holding that because the plaintiff had expressly consented to the use of his surname in the tradename adopted by the defendant grocery store owners "he waived any right of privacy which he had in this matter" and "had no right to enjoin the defendant from using his surname in its tradename upon the ground that it violated any right of privacy which he possessed.").

As discussed above, Shaya Restaurant does not use Alon Shaya's name or likeness to advertise its restaurant. The one instance where Alon Shaya's name was still referenced on a Google map listing has been corrected. Moreover, Mr. Shaya unequivocally agreed to naming the restaurant "Shaya" back in 2014, and there was never any contractual restriction placed on the Company's legal right to continue to use the name and mark in commerce in the event Mr. Shaya was one day no longer part of the business. Indeed, the Operating Agreement specifically articulates what is owed to a member, such as Mr. Shaya, upon departure from the Company, and the Company's continued use and ownership of its name is not disturbed if such a departure occurs. There is, unquestionably, no invasion of Mr. Shaya's privacy or attempted control over his likeness or persona by Shaya's continued operation under that name. And, again, it is public knowledge that he is no longer part of the restaurant. This claim, like the others, fails on the face of the motion and lack of any evidentiary support.

CAS has not demonstrated likelihood of success on any of the underlying claims at issue.

## C.    There is no substantial threat of irreparable injury to CAS.

The harm to an applicant must be sufficiently defined and imminent to justify the extraordinary remedy of a preliminary injunction. *Google*, 822 F.3d at 228. Moreover, it must be "likely" that the applicant for a preliminary injunction will "suffer irreparable harm before a decision on the merits can be rendered." *Winter*, 555 U.S. 7, 22 (2008).

CAS is not truly threatened with irreparable harm, as demonstrated by its four-month delay in seeking injunctive relief. *See BuzzBallz, LLC. v. JEM Beverage Co., LLC*, No. 3:15-CV-588-L, 2015 WL 3948757, at *6 (N.D. Tex. June 26, 2015) ("Plaintiff's delay in seeking a preliminary injunction rebuts any presumption of irreparable harm."). In trademark cases, "courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417 (S.D.N.Y. 1998); *see*

*also Stokely-Van Camp, Inc. v. Coca-Cola Co.*, No. 86 C 6159, 1987 WL 6300, at *3 (N.D. Ill. Jan. 30, 1987) "[T]he fact that Stokely waited three months indicates a lack of a need for the extraordinary remedy of a preliminary injunction."). CAS not only has sat back while the restaurant has continued to operate successfully for the past four months, but it attaches to Mr. Shaya's declaration an email and "tweet" containing high praise for the restaurant after Mr. Shaya's departure, demonstrating the exact opposite of any supposed harm to his reputation.

### D. The potential injury to Shaya Restaurant outweighs any alleged harm to CAS.

"The court must not only determine that the plaintiff will suffer irreparable harm if the preliminary injunction is denied - a threshold requirement for granting a preliminary injunction - but also weigh that harm against any irreparable harm that the defendant can show he will suffer if the injunction is granted." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). In one of the *Brennan's* cases, for example, the district court weighed the potential harm that alleged confusion or dilution might cause between the time of application for preliminary injunction and trial against the permanent consequences of disruption to the defendant's business that would result from the requested name change. *Brennan's, Inc. v. Brennan's Rest., LLC.,* No. 02 CIV. 9858 (RLC), 2003 WL 1338681, at *7 (S.D.N.Y. Mar. 18, 2003). The court concluded that even if the applicant had shown a serious case on the merits, it could not show that the balance of hardships tipped in its favor. *Id.* ("The disruption of defendants' business that would flow from any requirement that it change its name would work a greater hardship than plaintiff suffering such confusion or dilution (if any) that might possibly occur prior to trial.").

As explained by Mr. Mantilla, who has extensive experience in the local and national restaurant industry, including in opening and branding restaurants, attempting simply to rename or

rebrand an existing restaurant is an extremely risky and usually unsuccessful course of action.[54] It is typically only advised when a restaurant is failing, as it signals to the public, whether fairly or not, that there is a problem with the restaurant's goods and services. If CAS's motion were to be granted, Shaya Restaurant would essentially be in a position of having to start over, losing the value, fame, and goodwill that the restaurant has developed. And starting a new restaurant is also a risky and expensive effort, even with the resources that Shaya Restaurant and BRG have, as new restaurants have about a 20% chance of succeeding.[55] Indeed, even with all the interest and anticipation Shaya Restaurant and BRG created for Shaya, which is indisputably a success, Shaya did not begin making a profit until after 20 months of operations.[56] If the Company is enjoined from operating under the "Shaya" name and mark through trial, it will be forced to close the restaurant, come up with a new concept, and start anew, which could easily take six months to a year.[57] And, a new restaurant would not immediately operate in the black, but would likely take two to three years to become profitable.[58] Although CAS asserts that such a "name change" should not be burdensome, notably, Mr. Shaya acknowledged back in 2016 that the restaurant would likely need a year to restructure "into something new" if it had to change its name.[59]

### E.  Granting the preliminary injunction would disserve the public interest.

When the issuance of a preliminary injunction would put a restaurant out of business and not remedy any identifiable wrong against the applicant, a preliminary injunction is against the

---

[54] Mantilla dec., Ex. A, ¶¶ 42-44.

[55] *Id.*, ¶¶ 42-45. Mr. Mantilla also has reviewed the records of Shaya Restaurant and has detailed the significant costs incurred for the start-up of that restaurant and other BRG restaurants. *Id.*, ¶ 25.

[56] *Id.*, ¶ 45.

[57] *Id.*, ¶ 25.

[58] *Id.*, ¶ 45.

[59] Ex. D-3.

public interest. *See*, *e.g.*, *Noodles Dev., LP v. Ninth Street Partners, LP*, 507 F. Supp. 2d 1030, 1039 (E.D. Mo. Apr. 13, 2007) (explaining that it does not serve the public interest essentially to put a restaurant out of business where the injunctive relief does not remedy any identifiable harm).

**F.    A substantial bond would be required for the injunction sought.**

If the Court were to issue a preliminary injunction, CAS will be required to post security sufficient to cover Shaya Restaurant's costs and potential damages for a wrongful injunction. Fed. R. Civ. P. 65(c); *Phillips v. Charles Schreiner Bank*, 894 F.2d 127, 131 (5th Cir. 1990). The bond required by Rule 65 is more than a mere formality:

> [T]he bond requirement serves to protect the interests of both parties. It assures the enjoined party that it may readily collect damages in the event that it was wrongfully enjoined, without further litigation and without regard to the possible insolvency of the applicant, and it provides the plaintiff with notice of the maximum extent of its potential liability. Because of the importance of the bond requirement, failure to require the posting of a bond or other security constitutes grounds for reversal of an injunction.

*Phillips*, 894 F.2d at 131.

Pursuant to Rule 65(c), CAS should be required to post a bond sufficient to reimburse Shaya Restaurant for any injury it may suffer as a result of the preliminary injunction, which would include the substantial costs of developing and opening a new restaurant, the loss of Shaya Restaurant's revenue stream, and the potential loss of the value of the entire business if a new restaurant does not succeed in the Shaya space. Those damages will be in the millions, as evidenced by Mr. Mantilla's declaration.

## IV.    CONCLUSION

CAS's motion fails for multiple reasons, but the Court need look no further than Mr. Shaya's own admissions in Exhibits D-1 through D-3 to deny the motion based on his knowledge that neither he nor CAS owns or has any rights to the "Shaya" name and mark.

Respectfully submitted,

 /s/ Jennifer L. Thornton
Richard C. Stanley, 8487 T.A.
Bryan C. Reuter, 23910
Jennifer L. Thornton, 27109
Brendan A. Curtin, 35732
STANLEY, REUTER, ROSS,
  THORNTON & ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone:   504-523-1580
Facsimile:   504-524-0069

*Counsel for Shaya Restaurant, LLC, John Besh,
and Octavio Mantilla*

## CERTIFICATE OF SERVICE

Undersigned counsel has served a copy of this response on all counsel of record by email,

U.S. Mail, and/or via the Court's ECF system on January 23, 2018.

*/s/ Jennifer L. Thornton*

26